IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

INGRID L. CHANEY,          *

                          *

    Plaintiff,         *

                          *

vs.                   *   CIVIL ACTION 06-00204-CG-B

                          *

MICHAEL J. ASTRUE,      *

Commissioner of        *

Social Security,        *

                          *

    Defendant.        *

## REPORT AND RECOMMENDATION

Plaintiff Ingrid L. Chaney ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq.  Oral argument was held on April 10, 2007.  Upon careful consideration of the administrative record, memoranda of the parties and oral argument, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED.**

I.   **Procedural History**

Plaintiff protectively filed applications for period of disability and disability insurance benefits in May 2002, alleging that she has been disabled since April 4, 2001, due to a seizure disorder, headaches and essential hypertension.  (Tr. 52-53, 122-125, 138).  Plaintiff's application was denied upon initial review and upon reconsideration.  (Id. at 52-53).  She filed a timely

Request for Hearing before an Administrative Law Judge ("ALJ"). (<u>Id</u>. at 77). On January 3, 2003, Administrative Law Judge David R. Murchison ("ALJ Murchison") held an administrative hearing and on March 24, 2003, he entered an unfavorable decision wherein he concluded that Plaintiff is not disabled. (<u>Id</u>. at 54-68). Thereafter, upon a request for review, the Appeals Council ("AC") vacated the ALJ's decision and remanded the case for further proceedings. (<u>Id</u>. at 107-109). ALJ Murchison conducted a second hearing on January 7, 2005, which was attended by Plaintiff, her representative and a vocational expert. (<u>Id</u>. at 29-50, 85-86). On March 7, 2005, the ALJ issued an unfavorable decision again finding that Plaintiff is not disabled. (Tr. 16-28). The AC denied Plaintiff's request for review on March 15, 2006; thus, the ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981. (<u>Id</u>. at 6-9, 12). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**II.   <u>Issue on Appeal</u>**

A.   Whether the ALJ erred by failing to state what weight he assigned to the opinion of Certified Nurse Practitioner Renee Drinkard?

**III. <u>Factual Background</u>**

Plaintiff was born on October 2, 1969, and was 35 years old at the time of the administrative hearing. (Tr. 44, 123). Plaintiff

has a 12th grade education and past work experience as a substitute teacher, cashier/supervisor, receptionist, switchboard operator and aircraft mechanic. (Id. at 44, 139, 144, 149-157, 180). Plaintiff testified that she cleans house, attends church daily and sometimes drives. (Id. at 38). She reported that suffers from 10 "staring spells" (seizures) daily, memory loss and unsteadiness. (Id. at 32-33, 37, 41). She testified that her high blood pressure and seizure medications work "pretty good," but that her seizure medication causes drowsiness. (Id. at 34). Plaintiff's medications have included Carbatrol, Diovan, Depakote, Phrenilin, Propranolol, Meclizine, Nydrocodone, Amitriptyline, Prednisone, Imitrex, B-D 1 ml, D.H.E. 45, Cephalexin, Floxin, Difulcan, Sulfamethoxazole, Gynazole-1 cream, Maxalt, Metronidazole, Acetaminophen, Erythromycin, Hydrocodone, Naproxen and Keppra. (Id. at 143, 158-160, 182-185A, 190).

## IV.   **Analysis**

### A.   **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[1] A court

---

[1] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding that substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.  Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

B.   **Discussion**

An individual who applies for Social Security disability benefits must prove his disability.  20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a).  The Social Security

4

regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.  20 C.F.R. §§ 404.1520, 416.920.[2]

In case sub judice, the ALJ determined that Plaintiff met the nondisability requirements for a period of disability and disability insurance benefits and was insured for benefits through the date of the decision.  (Tr. 16-28).  The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  (Id.)  The ALJ determined that while Plaintiff has the severe impairments of hypertension and a seizure disorder, they do not meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4.  (Id.)  The ALJ also found that while Plaintiff's allegations regarding the existence of her seizure

---

[2]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  Id. at 1005.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).  See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

disorder and headaches were credible, the degree of limitation alleged was not supported by the credible evidence of record. (Id.) The ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform a range of unskilled medium work, and that while she is unable to perform any of her past relevant work ("PRW"), other work exists in the national economy that she can perform pursuant to Medical-Vocational Rule 203.21 and the testimony of a vocational expert. (Id.) Thus, the ALJ found that she is not disabled. (Id.)

The relevant evidence[3] reveals that Plaintiff was seen at the Franklin Memorial Primary Health Center ("Franklin") on July 12, 1995. (Tr. 201). She reported a seizure disorder. (Id.) Plaintiff indicated that her first seizure had occurred three weeks earlier and that a second seizure had occurred two weeks earlier. (Id.) On February 1, 1999, Plaintiff reported that following her 1995 seizures, she had not had any seizures and that she had not taken her seizure medication for one year. (Id. at 197). During visits on April 9, 1999 and January 20, 2000, Plaintiff reported that she had suffered "no seizures." (Id. at 194, 196). On August 14, 2000, Plaintiff reported that she had experienced a seizure two weeks earlier. (Id. at 191).

Plaintiff was next treated by W.J. Nowack, M.D. ("Dr.

---

[3]The only issued raised by Plaintiff relates to her seizure disorder; thus, while the undersigned has reviewed all of the record evidence, only that evidence pertaining to this disorder, and before the ALJ, is specifically addressed herein.

Nowack"), John D. Rothrock ("Dr. Rothrock"), Charles Markle, M.D. ("Dr. Markle"), William Hamilton, M.D. ("Dr. Hamilton") and a "Dr. Boggs," as well as by Certified Nurse Practitioner Renee Drinkard ("Ms. Drinkard"), at the University of South Alabama's Medical College Department of Neurology ("USA"). (Tr. 186, 188-189, 210-240, 269-270, 274-281, 363, 369, 371-373, 381). During 2000, Plaintiff had four office visits. (Id. at 223-224, 237-240, 269-270). In August 2000, she complained of possible seizure reoccurrences and reported that she had experienced her first seizure in 1995, and that she experienced a seizure a few days earlier. (Id.) Dr. Nowack noted that Plaintiff's etiology of symptoms was "not exactly clear . . . most likely complex partial seizures with possible secondary generalization . . . . She also could be hav[ing] migraine-associated convulsive syncope. The absence of any records regarding the patient's prior work-up makes medical decision making much more complex." (Id. at 270). Plaintiff was prescribed Divalproex and instructed not to drive or to participate in activities where she might hurt herself. (Id.) Her brain MRI was essentially normal, and Dr. Nowack noted that electroencephalograph testing "could supply minimal support for the clinically suspected complex partial epilepsy." (Id. at 223-224). By November 2000, Plaintiff reported that she had been seizure free for months. (Tr. 236). She was instructed not to drive. (Id.)

During 2001, Plaintiff had ten office visits. (Id. at 209-

222, 228-235, 275-279).   During a February visit, Plaintiff reported that she had experienced no seizures since her last visit. (Id. at 210-212, 234, 277-278).  It was noted that Plaintiff was on Depakote medication for seizure prophylaxis and that the dosage had been increased, and she was given instructions in self-administration of DHE.   (Id.)   Plaintiff reported experiencing seizure activity in March 2001, and in April 2001, Dr. Nowack authored a letter wherein he noted that she had experienced many spells involving the loss or alternation of consciousness, and that until she was seizure free for six months, she should not drive or participate in activities where she might hurt herself or others if she had a seizure.  (Id. at 232, 275).  Dr. Nowack also indicated that Plaintiff's EEGs did not provide proof of the nature of her seizure spells, and that she should be admitted for intensive monitoring in the Epilepsy Unit to provide such proof.  (Tr. 276).

During May 2001, Plaintiff was admitted to USA Hospital for five days after complaining of seizure activity.  (Id. at 213-221). Plaintiff reported that she had experienced four seizures in 1995, one in 2000, and one in 2001.  (Id.)  Dr. Nowack noted that a past EEG suggested left anterior temporal discharging dysfunction, and that he had placed Plaintiff on Depakote.  (Id.)  Plaintiff was diagnosed with partial complex seizures, placed on EMU for monitoring, and she was to be tapered off of her Depakote and Topiramate medications.  (Id.)  Her EEG monitoring was "mildly

8

supportive" and "suggestive" of complex partial seizures. (<u>Id</u>.)
She was warned against driving, operating machinery or undertaking
any dangerous activities. (Tr. 213-221).

During her June 2001 visit, Plaintiff reported that she had
not had any more seizures; however, during a September visit with
Dr. Boggs, she reported that she had suffered a seizure two weeks
earlier, while sleeping. (<u>Id</u>. at 229-230). Her Carbatrol was
increased and she was instructed no to drive until she went six
months without a seizure. (<u>Id</u>.) In December 2001, Plaintiff
reported that she had experienced a seizure at Thanksgiving which
included numbness, shaking and biting her tongue. (<u>Id</u>. at 228).
She was again instructed against driving. (<u>Id</u>.)

During 2002, Plaintiff had four office visits. (<u>Id</u>. at 225-
227, 274, 280-281, 363). By September 2002, Plaintiff had reported
a total of seven seizures, and complained of suffering from
"staring spells" once a day, with some associated memory and speech
problems, and fatigue and drowsiness. (Tr. 225-227, 274, 280-281,
363). She also reported poor balance and difficulty focusing and
tremors, but indicated that her headaches had improved. (<u>Id</u>.) Her
Carbatrol and Keppra were increased during different visits. (<u>Id</u>.)

In December 2002, neurologist Dr. Hamilton completed a
Supplementary Report for Benefits Form at the request of
Plaintiff's private disability insurance carrier, in which he noted
that she had been diagnosed with complex partial seizures, and

opined that she had no functional cardiac limitations, no physical/exertional limitations and no psychiatric impairments. (Id. at 280-281). Dr. Hamilton added that job modification would enable the Plaintiff to work with her impairment, and that her only work-related limitation was that she should not drive or perform duties where the risk of an injury could occur if she experienced a seizure. (Id. at 281).

In 2003, Plaintiff had one office visit in September during which she was seen by nurse Drinkard. (Id. at 369). Plaintiff reported that she had not experienced a seizure since May 2003, but that she "stare[d] off" at times. (Tr. 369). Nurse Drinkard noted that her condition was "improved" with medication, and that her seizures were "under better control." (Id.) Dr. Hamilton reviewed the findings and concurred. (Id.)

During 2004, Plaintiff had four office visits during which she was seen by nurse Drinkard. (Id. at 186, 188-189, 370-373, 381). In November, Plaintiff reported that she had not had any seizures, and nurse Drinkard indicated that Plaintiff was "much improved" with Keppra, although she reported that she continued to "stare off." (Id. at 381). Plaintiff was instructed not to drive until she was seizure free for six months. (Id.) Dr. Hamilton reviewed the findings and concurred. (Tr. 381). In December, nurse Drinkard completed a Supplementary Report for Benefits form, wherein she stated that Plaintiff had been diagnosed with complex

partial epilepsy, suffered from seizures, was treated with medication and "should not drive or perform duties with a risk of injury if seizures would occur." (<u>Id</u>. at 188-189). Additionally, nurse Drinkard completed a Seizure Questionnaire, wherein she opined that Plaintiff suffered from epilepsy; her epilepsy had been documented by video EEG monitoring that she hds complex partial seizures during which she lost consciousness for 10-20 minutes and would take 45 minutes to regain normal function; she suffered from seizures 1-2 times per month; she took medication which was effective in controlling her seizures; while she suffered from the side effect of drowsiness from her medication, it would not cause her to be unable to sustain normal concentration or pace in a work type setting; her condition was not expected to improve; and she was "stable on anticonvulsant therapy." (<u>Id</u>. at 186).

Plaintiff was also treated at IMC-Mobile Family Physicians for various complaints, including seizures, from January 2001 to October 2002. (<u>Id</u>. at 282-305). Plaintiff reported a history of seizure disorder, and that she was taking Carbatrol for same. (<u>Id</u>. at 293-305). She also reported suffering from episodic "inside" tremors which lasted about one minute, which were becoming more frequent, and which resulted in a "very funny feeling." (<u>Id</u>. at 293-294). She was assessed with a seizure disorder and started on Diovan. (Tr. 293-305). In October 2002, Plaintiff was instructed to return for a re-evaluation if her "tremor-like episode" did not

subside.  (Id. at 293).

On July 8, 2002, Plaintiff reported to David Formwalt, Psy. D. ("Dr. Formwalt") that she has been treated for epilepsy since 1995; that she had to change her medication "numerous times" because sometimes it worked and sometimes it did not; that she last suffered a grand-mal seizure in May 2002; and that her seizures occured in her sleep.  (Id. at 241).  On August 15, 2002, a State Agency medical consultant completed a Residual Functional Capacity Assessment (Physical) Form, from a review of the medical records, and concluded that Plaintiff had no established exertional limitations; could occasionally climb ramps/stairs; could never climb ladders, ropes and scaffolds; had no established manipulative, visual or communicative limitations; and should avoid all exposure to unprotected heights and commercial driving.  (Id. at 260-268).

On November 9, 2004, consulting State Agency neurologist Dr. John G. Yager, M.D. ("Dr. Yager"), of the Neurology Center, P.C., conducted a physical examination of Plaintiff.  (Id. at 374-375). Dr. Yager noted that Plaintiff reported having nocturnal seizures, she had not had any seizures since January, her examination revealed normal results in all aspects, and she takes Keppra to treat her seizures which resulted in "the best control [of her seizures that] she has had."  (Id.)  Dr. Yager concluded that Plaintiff would be capable of work-related activities, and that she

would only be prohibited from being at uncontrolled heights and should not be driving as part of any job. (Tr. 375). Also on this date, Dr. Yager completed a Medical Source Opinion (Physical) Form, in which he determined that Plaintiff has no limitations regarding her ability to sit, stand or walk; can frequently lift or carry up to 40 pounds; can occasionally lift or carry up to 60 pounds; can constantly lift or carry up to 25 pounds; can frequently climb with only a prohibition as to unprotected heights; can occasionally work in proximity to moving mechanical parts; can constantly, push/pull using her arms and legs, balance, stoop, kneel, crouch, crawl, handle, finger, feel, walk, hear and reach overhead; can constantly work around extreme cold/heat, wetness/humidity and around exposure to fumes, noxious odors, dust, mists, gases or poor ventilation; and is only prohibited from work around dangerous machinery and high, exposed places, and from driving. (<u>Id</u>. at 376-378). He added that she cannot go swimming alone. (<u>Id</u>. at 378).

## 1. <u>Whether the ALJ erred by failing to state what weight he assigned to the opinion of Certified Nurse Practitioner Renee Drinkard?</u>

Plaintiff contends that the ALJ erred by failing to state what weight he assigned to the treatment notes and Seizure Questionnaire completed by Certified Nurse Practitioner Renee Drinkard ("Nurse Drinkard"), because evidence from "acceptable medical sources" was provided such that her findings – as an "other source" – should have been considered. In his decision, the ALJ stated, in relevant

13

part, as follows:[4]

> . . . . The foregoing residual functional capacity is based in large measure upon the opinion of Dr. Yager in Exhibit 19F. That the claimant is able to work is also supported by the observations of Dr. Formwalt in Exhibit 5F at 3-4; by the opinion of Dr. Crump in Exhibit 7F; by the opinion of Dr. Novak [sic] in Exhibit 11F at 2, 6; by Dr. Hamilton's opinion in Exhibit 12F at 2; by the physical examination in Exhibit 13F at 13; by Dr. Kovacs' office note from Exhibit 15F at 2; and by the assessments in Exhibit 18F at 2 and Exhibit 20F at 2.

> . . . . [she] has substantially fewer staring spells after treatment. See e.g. Exhibit 18 F at 2, 20F at 2. Her symptom calendar was not persuasive as the page that should have shown her last grand mal seizure was not produced, while all other pages reflecting January 2002 symptoms were produced. Compare Exhibit 13F at 20 with Exhibit 14F at 6-9. The "worse than ever" blurry vision reported in Exhibit 13F at 16 is not even documented at Exhibit 14F at 20-21, compare Exhibit 14F at 31-32.

(Tr. 21-22).

At the outset, a review of the ALJ's decision reflects that he neither ignored nor explicitly rejected nurse Drinkard's findings. Rather, it is clear that he gave careful consideration to nurse Drinkard's treatment notes. Contrary to Plaintiff's assertions, the ALJ was not required to assign any weight to either nurse Drinkard's December 2004 Seizure Questionnaire or her treatment notes. Indeed, Social Security Regulations provide that the

---

[4]Exhibit 5F (Dr. Formwalt); Exhibit 7F (State Agency Physician's RFC); Exhibit 11F (Dr. Nowack's 2001-2002 notes from USA); Exhibit 12F (Dr. Hamilton); Exhibit 13F (IMC records 2001-2002); Exhibit 15F (Nurse Drinkard's September 2002 USA record); Exhibit 16F (Dr. Kovacs' treatment notes); Exhibit 18F (Nurse Drinkard's March 2004 USA record); Exhibit 19F (Dr. Yager's reports); Exhibit 20F (Nurse Drinkard's November 2004 USA record). The ALJ referenced Exhibit 15F as containing Dr. Kovacs's notes; however, Dr. Kovacs's notes are contained at Exhibit 16F and Nurse Drinkard's records are contained at Exhibit 15F.

findings of a nurse practitioner are not considered "an acceptable medical source." 20 C.F.R. §§ 404.1513(a), 404.1513(d)(1), 416.913(a), 416.913(d)(1). The Regulations provide further, that in addition to evidence from the "acceptable medical sources" listed in paragraph (a), "we may use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work . . . ." 20 C.F.R. §§ 404.1513(d), 416.913(d). Nurse practitioners are specifically listed as "other" medical sources who may present evidence of the severity of the claimant's impairment and the effect of the impairment on the claimant's ability to work, but who cannot establish the existence of an impairment. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). <u>See</u>, <u>e.g.</u>, <u>Crawford v. Commissioner of Social Security</u>, 363 F.3d 1155, 1160 (11th Cir. 2004). Thus, while the ALJ is to consider other medical sources, he is not required to assign any specific weight to their findings, including those of nurse Drinkard.

Moreover, the record reflects that the ALJ reviewed the opinions of nurse Drinkard and gave them significant consideration. The ALJ specifically referenced her treatment notes, as follows:

- in December 2001, Plaintiff reported having seizures in her sleep and was diagnosed with complex partial seizures;

- in February 2002, Plaintiff presented with her last seizure occurring in January 2002 and was diagnosed with complex partial seizures;

- in May 2002, Plaintiff alleged suffering four seizures since February during her sleep (except

for one), and was diagnosed with complex partial seizures (Exhibit 4F);

- in September 2002, Plaintiff complained of headaches and stated that she was taking migraine medication, diagnosing her with episodic migraine and complex partial seizure disorder (Exhibit 15F);

- in September 2003, Plaintiff had no complaints of headache pain, and was "doing well" (Exhibit 17F);

- in March 2004, Plaintiff reported having no seizure activity other than two staring episodes daily (Exhibit 18F); and

- "subsequent treatment notes" indicated that she had "much improved" with medication (Exhibit 20F).

(Tr. 22-23, 25). The ALJ ultimately concluded that Plaintiff is able to work by relying not only on the findings of Drs. Yager, Formwalt, Nowack, Hamilton, Kovacs and the State Agency physician, but also due to nurse Drinkard's records, as he stated as follows: "[t]hat the claimant is able to work is also supported by the . . . assessments in . . . Exhibit[s] 15F, 18F and 20F. . . ." (Id. at 21 (referencing exhibits which contain nurse Drinkard's USA notes). As such, the ALJ did, in fact, consider nurse Drinkard's treatment notes in rendering his disability determination.

Furthermore, while the ALJ did not expressly discuss nurse Drinkard's December 2004 Seizure Questionnaire, there is no requirement that the ALJ reference each and every piece of evidence of record. This is particularly true here, because some of nurse Drinkard's Seizure Questionnaire findings are internally inconsistent as well as inconsistent with her own treatment notes.


See supra.  For instance, nurse Drinkard concluded that even though Plaintiff suffered from one or two seizures per month, her seizure medication was effective in controlling her seizures and she was "stable on anticonvulsant therapy."  Id.  Yet, Nurse Drinkard simultaneously concluded that the side effects from Plaintiff's medication would cause her to be unable to sustain normal concentration or pace in a work like setting.  Id.  These conclusions are internally inconsistent.  Likewise, the findings contained in nurse Drinkard's Seizure Questionnaire are inconsistent with her treatment notes, which reveal, for example, that Plaintiff had not had seizures one or two times per month (e.g., she reported in September 2003 that she had not had any seizures since May 2003, and reported in November 2004 that she had not had any seizures since May 2004), and that her seizure condition was "much improved."  See supra.

Finally, substantial evidence of record supports the ALJ's decision.  Specifically, the ALJ properly evaluated the treatment records of Plaintiff's acceptable medical sources with regard to her seizure disorder – records which revealed that no treating physicians had ever concluded that she was disabled.  Drs. Hamilton, Nowack, Yager and the State Agency physician all concluded that while Plaintiff has a seizure disorder, she has no exertional limitations and can work despite her condition with some job modifications (no driving and no work around unprotected

heights, dangerous machinery or in situations where she might harm herself or others if she suffered a seizure). _See_ _supra_. Similarly, the State Agency physician's RFC concluded that she had no exertional limitations and that she should just avoid work around unprotected heights and driving. _Id_. Notably, Nurse Drinkard did not even conclude that Plaintiff was disabled, but, instead, found that she was "stable" on her anticonvulsant therapy and that her seizure medication was "effective." _Id_. Dr. Yager additionally noted in November 2004, that Plaintiff reported that she had the "best control" over her seizures that she had ever had. _Id_. Likewise, the evidence of record confirms that Plaintiff's seizures were well-controlled with her medication:

- while Plaintiff complained of having a seizure in March 2001, in July 2001, she had experienced no further seizures;

- Dr. Hamilton stated that Plaintiff could work with her impairment so long as she did not drive as part of her job; and

- Dr. Yager's November 2004 findings revealed that Plaintiff had not experienced a seizure since January 2003 (about 10 months), and her examination was normal such that he concluded that she was capable of work-related activities and only prohibited from being at uncontrolled heights and from driving as part of her job.

_Id_. The undersigned's review of the record reveals further, that Plaintiff experienced extended periods of time without having any seizures: August 1995 to mid-July 2000; September 2000 through mid-March 2001; early December 2001 through early January 2002; mid-

August 2002 through early December 2002; June 2003 through November 2004. Id. And significantly, Plaintiff's self-reporting "Seizure Monitoring Calendar" revealed that she only had eight seizures, total, from December 13, 2001 through January 5, 2003. Id. In sum, neither nurse Drinkard's treatment notes nor her Seizure Questionnaire contradict the findings of Plaintiff's acceptable medical sources or the substantial medical evidence of record, much less support the argument that she is disabled.   As such, Plaintiff's claim must fail.

**V.     Conclusion**

For the reasons set forth, and upon careful consideration of the administrative record, memoranda of the parties and oral argument, it is **RECOMMENDED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for period of disability and disability insurance benefits, be **AFFIRMED.**

The attached sheet contains important information regarding objections to this Report and Recommendation.

**DONE** this **16**th day of **April, 2007.**

        /s/SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**

19

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
## AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
## <u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>

1.   **<u>Objection</u>**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(c); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **<u>Opposing party's response to the objection.</u>**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **<u>Transcript (applicable where proceedings tape recorded)</u>**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

**/s/SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**